51 F.3d 267
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PAVING EQUIPMENT OF CAROLINA, INCORPORATED, d/b/a
Mecklenburg Paving, Incorporated, Plaintiff-Appellee,
v.
LAKE PROVIDENCE PROPERTIES, INCORPORATED, Defendant-Appellant,
James E. WALL, Sr., Trustee, Party-in-interest.
 No. 94-1836.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 1, 1995.
Decided April 6, 1995.
 
 ARGUED: George Daly, George Daly, P.A., Charlotte, NC, for appellant. William Gene Robinson, Charlotte, NC, for appellee.
 Before MICHAEL and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Paving Equipment of the Carolinas, Inc., d/b/a Mecklenburg Paving, Inc. (Mecklenburg), filed a claim against the Chapter 11 bankruptcy estate of Lake Providence Properties, Inc. (LPP). The bankruptcy court allowed Mecklenburg's claim as a secured equity interest in one of LPP's subdivisions, and the district court affirmed. Finding no error, we affirm on the reasoning of the district court.
 
 I.
 
 2
 LPP is a real estate developer in North Carolina whose president and sole shareholder is William H. Nolan III. Mecklenburg is a paving contractor whose president and owner is Robert Yon. In the fall of 1991, LPP was developing three subdivisions known as Providence Hills, Lake Providence North, and Valley Ranch. Because LPP was running out of money, it approached Mecklenburg, which had worked for LPP in the past, about completing construction of the Providence Hills infrastructure. LPP agreed to provide the land and sell the developed lots if Mecklenburg would pay the construction costs. In return, Mecklenburg would receive part of the proceeds when the lots were sold.
 
 
 3
 The parties began their relationship with only a short "Memorandum of Understanding" that outlined the provisions of a future contract. Mecklenburg paid for and oversaw the work, portions of which were performed by subcontractors. It used both its own and LPP's equipment. Although not contemplated by the Memorandum, the work included several construction projects on LPP's other subdivisions.
 
 
 4
 At the same time, a dam and lake were under construction at Lake Providence North. As a result of a dispute with Lake Providence North landowners, Nolan was under a court order to have the dam and lake completed by a specified date. By November of 1991 the dam remained largely incomplete, and Nolan faced jail for contempt. Therefore, Nolan asked Mecklenburg to complete construction of the dam. Mecklenburg agreed, and the Memorandum was amended to reflect this agreement. Mecklenburg began work but stopped at Nolan's request after Nolan was not jailed at a state court contempt hearing.
 
 
 5
 By the spring of 1992, Mecklenburg was concerned that a final contract for the venture had not been prepared. A series of meetings between Yon, Nolan, and Nolan's attorney resulted in a "Joint Venture Agreement," signed on March 31, 1992. The agreement required Mecklenburg to complete development of Providence Hills and complete the lake and dam at Lake Providence North. LPP agreed to provide the land and sell the finished lots. Mecklenburg was to receive $20,497 per lot as the lots were sold. LPP secured its obligations by giving Mecklenburg a deed of trust on the Providence Hills subdivision.
 
 
 6
 Soon after the Joint Venture Agreement was signed, the parties ran into difficulties. In April, 1992, the dam had not yet been completed, and Nolan was jailed for contempt. This prompted Nolan to have Mecklenburg begin to work in earnest on the dam. By August, the companies were in financial trouble. Only one or two of the Providence Hills lots had been completed and sold, and a superior creditor had received the proceeds from these sales. Mecklenburg had difficulty obtaining funding because banks refused to lend to it when they learned of its association with Nolan. In November, Nolan told an employee that if Mecklenburg defaulted on the Joint Venture Agreement he would come out ahead $250,000 by not having to pay Mecklenburg for its work.
 
 
 7
 The parties' conflict came to a head in a dispute over the use of the proceeds from a lot sale. Mecklenburg wanted to use the proceeds to help fund construction of the lake, while Nolan wanted to use the money for personal expenses. Nolan told Mecklenburg to get off the job, and Mecklenburg complied. The projects remained incomplete, and a number of construction expenses remained unpaid. LPP filed for bankruptcy in January of 1993.
 
 
 8
 Mecklenburg filed a claim against the bankruptcy estate for its construction costs. The bankruptcy court held that Mecklenburg and LPP had been engaged in a joint venture and that Mecklenburg's claim constituted an action to recoup Mecklenburg's equity interest in the venture. The court allowed Mecklenburg's claim, rejecting LPP's argument that Mecklenburg could not recover under its contract because it was not licensed as a general contractor. Specifically, Mecklenburg's claim was allowed as a secured equity interest in LPP's Providence Hills subdivision. The court, however, subordinated Mecklenburg's claim to other allowed claims except for the equity claims of LPP and Nolan. Of the approximately $1.2 million that Mecklenburg sought, the court allowed a claim of slightly over $1 million. LPP appealed to the district court, which affirmed the bankruptcy court.
 
 II.
 
 9
 LPP challenges the bankruptcy and district court rulings on two grounds. First, it contends that Mecklenburg's claim should have been barred because Mecklenburg performed as a general contractor without the license required by North Carolina law. Second, it claims that the bankruptcy court erred in calculating damages. We address each contention in turn.
 
 
 10
 In North Carolina, a general contractor must be licensed by the state. N.C. Gen.Stat. ch. 87. At the time the parties began work, a "general contractor" was defined, in pertinent part, as
 
 
 11
 any ... corporation who for a fixed price [or] commission ... undertakes to ... construct or ... superintend or manage ... the construction of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking is forty-five thousand dollars ($45,000) or more.
 
 
 12
 Id. Sec. 87-1.
 
 
 13
 To enforce the statutory licensing requirement, North Carolina courts have developed a common law rule that an unlicensed general contractor may not recover at law on a construction contract. Baker Constr. Co. v. Phillips, 426 S.E.2d 679, 681 (N.C.1993); Bryan Builders Supply v. Midyette, 162 S.E.2d 507 (N.C.1968). This rule also prohibits recovery in quantum meruit, Bryan, 162 S.E.2d at 512, and it is intended to protect unsuspecting property owners from "incompetent builders." Zickgraf Enters., Inc. v. Yonce, 303 S.E.2d 852, 853 (N.C. Ct.App.1983).
 
 
 14
 Both parties agree that Mecklenburg has never had a general contractor's license. The district court assumed, without deciding, that Mecklenburg fell within the statutory definition of "general contractor." However, it found that the common law rule did not bar Mecklenburg's claim, which was for recovery of an equity interest in a joint venture* rather than contractual recovery.
 
 
 15
 The district court first affirmed the bankruptcy court's finding that LPP and Mecklenburg were joint venturers. The bankruptcy court had based its finding on the following facts: (1) LPP characterized the relationship as a joint venture in its initial pleadings; (2) the contract between the parties was entitled "Joint Venture Agreement"; (3) Mecklenburg was to receive part of the proceeds from the sale of each lot, rather than a fixed sum regardless of how many lots were sold; (4) the parties pooled their resources, with LPP providing land and selling the lots and Mecklenburg providing money and services; and (5) Mecklenburg did not keep job tickets or send invoices to LPP.
 
 
 16
 The district court then held that the common law rule against contractual recovery did not cover Mecklenburg's action for a share of the assets of the joint venture for several reasons. First, because Mecklenburg's compensation was contingent upon the success of the joint venture, rather than mere performance of a contract, Mecklenburg had a built-in incentive to perform competently. Second, the rule that an unlicensed general contractor may not recover on a construction contract stems from the more general common law principle that an illegal contract is unenforceable. Because Mecklenburg sought recovery under partnership law, a defense based in contract law need not apply. Finally, partnership law protects those in LPP's position by affording them additional remedies, including an action for breach of fiduciary duty.
 
 
 17
 With regard to the amount of the allowed claim, the bankruptcy court determined that the value of Mecklenburg's contribution to the joint venture was best reflected by Mecklenburg's costs. The court carefully examined each element of cost and allowed a claim of slightly over $1 million. The district court affirmed the bankruptcy court's calculation of costs.
 
 
 18
 We conclude that the district court did not err in declining to extend the common law bar on contractual recovery to this action and that the bankruptcy court did not clearly err in determining the amount of Mecklenburg's claim. We therefore affirm on the district court's reasoning. In re Lake Providence Properties, Inc., No. 3:93CV345-P (W.D.N.C. May 25, 1994).
 
 
 19
 AFFIRMED.
 
 
 
 *
 A joint venture is governed by the same law as a partnership. The main distinction between the two is that a joint venture is a temporary association for the purpose of a single undertaking, while a partnership envisions a continuing relationship among the parties. Pike v. Wachovia Bank & Trust Co., 161 S.E.2d 453, 460 (N.C.1968)